Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| AWILDA S. MELÉNDEZ RÍOS<br><br>Apelante<br><br><br>V.<br><br><br>ACADEMIA DEL PERPETUO SOCORRO<br><br>Apelada | KLAN202400807 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2022CV00408<br><br>Sobre: Represalias en el Empleo; Violación al derecho constitucional a la salud e integridad en el empleo; Procedimiento Sumario |
|---|---|---|

Panel integrado por su presidente, el Juez Rodríguez Casillas, Juez Marrero Guerrero y Juez Campos Pérez

Marrero Guerrero, Juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 31 de octubre de 2024.

Comparece la Sra. Awilda S. Meléndez Ríos (señora Meléndez Ríos o apelante) y solicita que revisemos una *Sentencia* dictada el 29 de mayo de 2024 por el Tribunal de Primera Instancia, Sala de Caguas (TPI).[1] En esta, el referido foro desestimó sumariamente el reclamo de la apelante a los efectos de que su despido había estado injustificado y que mediaron represalias en el mismo. Tras evaluar el expediente ante nuestra consideración, confirmamos el proceder del foro recurrido. Veamos.

-I-

El 14 de febrero de 2022, la señora Meléndez Ríos presentó una Querella contra su antiguo patrono, la Academia del Perpetuo Socorro (APS o apelada) al amparo de la Ley Núm. 115 de 20 de diciembre de 1991, Ley contra el Despido Injusto o Represalias por Ofrecer Testimonio, y la Ley Núm. 2 de 17 de octubre de 1961, Ley

---

[1] Véase apéndice de la apelante, págs. 317-340.

de Procedimiento Sumario de Reclamaciones Laborales.[2] La señora Meléndez Ríos alegó que APS la despidió de manera injusta por represalias, luego de solicitar un acomodo razonable y denunciar a la apelada ante el Departamento del Trabajo y Recursos Humanos por unas nóminas no pagadas.

Adujo la señora Meléndez Ríos que laboró para la APS, una escuela católica, dese el año 2000 en calidad de Consejera Profesional y que su desempeño siempre fue satisfactorio. Durante los meses de marzo y mayo de 2020, APS ofreció sus servicios de manera virtual debido a la Pandemia de COVID-19 que recién comenzaba. De manera que, todos sus empleados laboraron desde sus hogares para evitar el contagio entre estos y los alumnos. Para agosto del mismo año, la APS se dispuso a comenzar el nuevo año académico de manera presencial en el plantel escolar. Luego de suspender las clases presenciales el 4 de agosto de 2020 debido a un caso positivo de COVID-19 entre sus empleados, la APS reanudó labores en el plantel escolar el 19 de agosto de 2020.

Sin embargo, la señora Meléndez Ríos no regresó al plantel. El **22 de agosto de 2020**, la apelante se comunicó con el Departamento de Recursos Humanos de la APS para solicitar un acomodo razonable.[3] El mismo consistía en realizar sus labores desde su hogar ya que era una persona de alto riesgo de contagio de COVID-19 debido a su edad, 60 años. La señora Meléndez Ríos también adujo que su esposo tenía más de 60 años y que ella padecía de rinitis crónica no alérgica y sinusitis aguda recurrente. El **26 de agosto de 2020**, personal del Departamento de Recursos Humanos de la APS le comunicó a la señora Meléndez Ríos que se le podía autorizar trabajar de manera remota dos o tres días a la

---

[2] Véase apéndice de la apelante, págs. 1-14.
[3] Véase apéndice de la apelante, pág. 87.

semana hasta el 17 de septiembre.[4] Al día siguiente, el Departamento de Recursos Humanos de la APS le hizo llegar por correo electrónico a la apelante un calendario para que identificara en él los días que trabajaría desde su hogar.[5]

El **2 de septiembre de 2020**, la señora Meléndez Ríos replicó que no contestó la misiva de la APS porque el acomodo que solicitó era para trabajar totalmente virtual.[6] El **11 de septiembre de 2020**, personal de la APS le aseguró a la apelante que el centro de trabajo tomó las medidas necesarias para proteger la salud de sus empleados, en cumplimiento con los requerimientos de agencias federales y estatales.[7] Añadió el personal de la APS que *"[n]o obstante lo anterior, nuestra Institución desea comenzar un proceso interactivo con usted, para ver qué otro acomodo se le puede brindar"*. El **14 de septiembre de 2020**, la señora Meléndez Ríos envió una carta explicando que no había obtenido respuesta alguna sobre su solicitud de acomodo razonable.[8] Además, como alternativa al acomodo solicitado, propuso que se le otorgara una licencia sin sueldo hasta el mes de diciembre de 2020 o que se evaluara la posibilidad de ofrecer sus servicios como contratista independiente.

En una carta con fecha del **18 de septiembre de 2020**, el personal de la APS le aseguró a la apelante su compromiso con las leyes y la reglamentación aplicable.[9] Por ello, le extendieron nuevamente una invitación para participar de un proceso interactivo. El **22 de septiembre de 2020**, personal de la APS se comunicó vía correo electrónico con la señora Meléndez Ríos porque esta aún no había contestado al comunicado del 18 de septiembre.[10] De igual forma, la APS le proveyó otra alternativa de acomodo en la

---

[4] Véase apéndice de la apelante, pág. 88.
[5] Véase apéndice de la apelante, págs. 89-90.
[6] Véase apéndice de la apelante, pág. 91.
[7] Véase apéndice de la apelante, pág. 92.
[8] Véase apéndice de la apelante, pág. 93.
[9] Véase apéndice de la apelante, pág. 94.
[10] Véase apéndice de la apelante, pág. 95.

cual asistiría una semana a la academia y la semana siguiente realizaría su trabajo de manera virtual. El fin de este acomodo, según la APS, era que la señora Meléndez Ríos trabajara únicamente 10 a 11 días mensuales en el plantel. Ese 22 de septiembre, la señora Meléndez Ríos se comunicó con la APS en el cual expreso *"[n]ecesito que me expliques, por qué tengo que asistir a un proceso interactivo bajo la ley ADA"*.[11] Además, reiteró las opciones que le brindo a la APS en su misiva del 14 de septiembre.

Así continuaron las comunicaciones entre la apelante y el personal de la APS. En una carta con fecha del **13 de octubre de 2020**, la señora Meléndez Ríos aseguro que presentar evidencia de su condición sería una violación al *Health Insurance Portability and Accountability Act of 1996* (Ley HIPAA).[12] Durante todo este tiempo, la señora Meléndez Ríos nunca se presentó al plantel escolar. El **22 de octubre de 2020**, el personal de la APS le remitió una carta a la señora Meléndez Ríos notificándole que debido a su incumplimiento reiterado, se le suspendía de empleo y sueldo desde el 22 de octubre hasta el 20 de noviembre de 2020.[13] El **27 de octubre de 2020**, la apelante respondió al comunicado de la APS en el que expresó estar en desacuerdo con la determinación de la apelada debido a que reiteradamente comunicó los riesgos asociados a su edad y el COVID-19.[14] Además, la apelante alegó sentirse presionada y emocionalmente afectada por la determinación de la APS.

El **5 de noviembre de 2020**, personal de la APS le cursó un comunicado a la apelante informándole, entre otras cosas, que su incomparecencia al plantel escolar constituía un abandono de empleo.[15] El **12 de noviembre de 2020**, la señora Meléndez Ríos le suscribió una carta al personal de la APS en la cual solicitó el pago

---

[11] Véase apéndice de la apelante, pág. 96.
[12] Véase apéndice de la apelante, págs. 99-100.
[13] Véase apéndice de la apelante, pág. 101.
[14] Véase apéndice de la apelante, pág. 102.
[15] Véase apéndice de la apelante, pág. 103.

de unas horas trabajadas de manera virtual.[16] El 11 de diciembre de 2020, la APS le remitió una carta a la apelante para informarle que debido a su reiterado incumplimiento con las directrices impartidas, la suspendían de empleo y sueldo desde el 14 de diciembre de 2020 hasta el 29 de enero de 2021.[17] El **21 de diciembre de 2020**, la APS recibió un comunicado del Departamento del Trabajo notificando una querella que la señora Meléndez Ríos presentó en su contra por salarios adeudados.[18] El **20 de enero de 2021**, la APS suscribió una carta al Departamento del Trabajo notificando que, de buena fe, pagaría los días reclamados por la apelante.[19]

El **2 de febrero de 2021**, personal de la APS le cursó un comunicado a la señora Meléndez Ríos indicándole que se le ofrecía una última oportunidad para reportarse al plantel escolar o presentar la documentación pertinente.[20] Tendría hasta el 12 de febrero de 2021 para ello. De lo contrario, la APS aceptaría su negativa como abandono de empleo. El **28 de febrero de 2021**, la señora Meléndez Ríos respondió que no renunciaba a su empleo como Consejera Profesional.[21] El **15 de marzo de 2021**, el Departamento de Recursos Humanos de la APS suscribió un comunicado informándole a la apelante que estaba despedida por abandono de empleo, efectivo el 15 de febrero de 2021.[22] Por todos estos hechos, la señora Meléndez Ríos presentó la querella de epígrafe.

La APS contestó la querella y en síntesis, negó las alegaciones de la querellante/aquí apelante. Adujo la apelada que nunca discriminó a la señora Meléndez Ríos por represalias y que solo

---

[16] Véase apéndice de la apelante, págs. 104-105.
[17] Véase apéndice de la apelante, pág. 106.
[18] Véase apéndice de la apelante, págs. 108-109.
[19] Véase apéndice de la apelante, págs. 113-114.
[20] Véase apéndice de la apelante, pág. 116.
[21] Véase apéndice de la apelante, pág. 117.
[22] Véase apéndice de la apelante, págs. 118-119.

intentó cumplir con las leyes que rigen los acomodos razonables. La APS alegó que no otorgó el acomodo de su faz porque las razones de la apelante no eran suficientes y esta última se negó a proveer información pertinente sobre sus condiciones médicas.

Luego de varios trámites procesales, el 2 de diciembre de 2022 la APS presentó una *Moción de Sentencia Sumaria.*[23] En ella, planteó que la Querella incoada era improcedente porque, en primer lugar, la APS no despidió a la señora Meléndez Ríos en represalia sino que ésta abandonó su empleo. Como prueba de ello, presentó todos los comunicados entre la APS y la apelante, donde la apelada le requirió en múltiples ocasiones a la señora Meléndez Ríos que regresara al plantel escolar y participara del proceso interactivo. Sobre la querella presentada ante el Departamento del Trabajo, la APS adujo que la misma era una infundada. Primeramente, la querella se presentó luego de que la señora Meléndez Ríos fuera objeto de dos medidas disciplinarias por no participar del proceso interactivo, no presentar la evidencia médica solicitada y sobre todo por no presentarse a trabajar de forma presencial en varios meses. Por otro lado, la APS señaló que la oficina de la señora Meléndez Ríos contaba con filtros de aire HEPA que proveían un ambiente seguro para realizar sus labores. Finalmente, la APS planteó que la edad de la señora Meléndez Ríos no era por sí un factor incapacitante ni una excusa válida para no trabajar de manera presencial.

Por su parte, la señora Meléndez Ríos presentó *Oposición a Solicitud de Sentencia Sumaria* y adujo que existía controversia sustancial de hechos medulares que impedían se dictara sentencia sumaria. La señora Meléndez Ríos aceptó el contenido de las comunicaciones habidas entre ella y la APS, pero se opuso a la interpretación otorgada por la apelada. Negó que su solicitud de

---

[23] Véase apéndice de la apelante, págs. 29-66.

acomodo razonable fuese única y exclusivamente por su edad, sino por sus condiciones respiratorias no incapacitantes que sumadas a su edad y el espacio cerrado donde se pretendía que trabajara, representaba un riesgo para su salud. Arguyó que fue suspendida de empleo y sueldo en represalia por presentar su preocupación de trabajar de manera presencial y por presentar una acción de salarios ante el Departamento del Trabajo. Adujo que el manual de empleados de la APS no atendía asuntos relacionados a la pandemia del COVID-19, que la apelada ignoró sus preocupaciones y que las opciones que brindó la APS no constituían un acomodo razonable.

La señora Meléndez Ríos arguyó que la APS incurrió en un patrón de presión y hostigamiento para que sus empleados trabajaran de manera presencial. Arguyó, además, que la APS no le explicó en qué consistía el proceso interactivo ni la razón por la cual debía participar de manera presencial. Adujo la señora Meléndez Ríos que la APS, entre otras cosas, la excluyó de actividades y entrega de regalos y que la APS rechazó las tres opciones de trabajo que propuso. A saber: trabajar completamente desde su hogar, que se le otorgara una licencia sin sueldo hasta el mes de diciembre de 2020 o que se evaluara la posibilidad de ofrecer sus servicios como contratista independiente. Concluyó la señora Meléndez Ríos que las actuaciones de la APS fueron abusivas, caprichosas y prepotentes. Finalmente, añadió la apelante que su Querella no era sobre discrimen por impedimento, porque *ella nunca alegó ser una persona con impedimentos y que siempre trabajó para la APS sin necesidad de un acomodo razonable*. Alegó que la propia APS quien inició el proceso de acomodo razonable.

Examinados los planteamientos esbozados, el TPI emitió su *Sentencia* el 29 de mayo de 2024 donde formuló las siguientes determinaciones de hechos:[24]

1. La APS es una escuela católica que tiene como fin la evangelización a la fe cristiana de los alumnos y la excelencia académica.

2. La querellante Meléndez laboró para la APS.

3. Meléndez se desempeñaba como Consejera Profesional.

4. El salario más alto devengado por Meléndez durante los últimos tres (3) años de empleo fue de $31,710.12 anuales, equivalentes a $2,642.51 mensuales, y $609.81 semanales, sin contar con otros beneficios susceptibles de cómputo monetario, tales como plan médico, bonos, etc.

5. La APS evaluó el desempeño laboral de Meléndez durante los años en que esta laboró allí, siendo dicho desempeño uno satisfactorio.

6. Meléndez ofrecía sus servicios en forma individual o grupal para ayudar a los estudiantes o tomar decisiones y planificar su futuro. En el área de salud mental y social, la querellante daba un continuo seguimiento, apoyo y referido al estudiante dependiendo de sus necesidades.

7. En marzo de 2020, el Gobierno de Puerto Rico decretó un cierre total de las operaciones gubernamentales y de la empresa privada, debido a la Pandemia COVID-19. Se eximieron de ese cierre total algunas agencias y/o funciones de funcionarios públicos que eran esenciales para la marcha adecuada de los asuntos gubernamentales, como también, algunos negocios privados que eran esenciales para el sostenimiento de la sociedad como fueron las farmacias, supermercados, gasolineras, entre otros.

8. En el semestre de marzo a mayo de 2020, la APS operó a través de cursos por internet (clases virtuales), no se ofrecieron clases presenciales, debido al cierre decretado por el gobierno.

9. En el primer semestre del Año Escolar 2020-2021, Meléndez fue a trabajar los días 3 y 4 de agosto.

10. El 4 de agosto se informó que una empleada de la APS tenía COVID-19, por lo que se activó el protocolo de la escuela y se suspendieron las clases de forma presencial hasta el 19 de agosto de 2020.

11. Meléndez no regresó a trabajar de forma presencial luego del 4 de agosto de 2020.

12. El 20 de agosto de 2020 el Prof. Francisco A. Vélez Dones, Director de Asuntos Académicos y Estudiantiles de la APS, emitió un comunicado en el cual, entre otras cosas, expuso sobre el protocolo para el manejo y control del COVID-19 en sus predios e indicó el procedimiento para atender las peticiones para que se autorizara el trabajo de manera virtual. En específico, indica dicha comunicación que:

---

[24] Véase, apéndice de la apelante, págs. 317-341.

*"6. Si usted tiene una situación particular, debe presentar la misma a Recursos Humanos. Cada caso se evaluará individualmente, por sus propios méritos partiendo de un marco de razonabilidad. En general, catalogamos las peticiones en dos categorías, a saber:*

*a. Peticiones de acomodo razonable por condiciones de salud: Deben venir acompañadas por una orden médica que contenga el diagnóstico del empleado, las razones por las cuales su condición representa una barrera o limitación para el trabajo presencial, y recomendación del acomodo razonable. La oficina de Recursos Humanos evaluará cada caso y determinará, el curso de acción a seguir, de acuerdo a la necesidad institucional y la capacidad para ofrecer un acomodo, para la función del empleado. Se garantiza la confidencialidad total en el manejo de la información ofrecida.*

*b. Solicitud de consideración por otras circunstancias: Debe explicar la situación particular que experimenta, y la solicitud específica que desea hacer. La oficina de Recursos Humanos evaluará la misma y determinará si puede o no concederse, manteniendo siempre equidad y justicia en el proceso evaluativo, agotándose además todos los recursos disponibles."*

13. El 22 de agosto de 2020, la parte demandante suscribió una comunicación a la Sra. Dulce Concepción del Departamento de Recursos Humanos, en que solicitó brindar sus servicios de forma virtual a tiempo completo, sin tener que presentarse a la escuela, debido a que era una persona de alto riesgo de contagio de COVID-19 al tener 60 años de edad, que su esposo era longevo y, también, expuso que padecía de rinitis crónica no alérgica y sinusitis aguda recurrente.

14. El 26 de agosto de 2020, la Sra. Dulce Concepción le contestó la comunicación Meléndez y le expresó que se le autorizaba a trabajar desde la casa 3 (tres) o dos (2) días por semana hasta el 17 de septiembre de 2020, fecha tentativa para el regreso a clases de forma presencial y se le incluyó un calendario para que en el mes de septiembre marcara los días que podía estar presencialmente en la academia.

15. El 27 de agosto de 2020, la Sra. Dulce Concepción, Directora de Recursos Humanos de la APS, suscribió una comunicación a Meléndez, en la cual expuso: "Adjunto calendario de las primeras dos semanas de septiembre. Favor de marcar los días que estará presencialmente en la Academia. Entregarlo antes del lunes, 31 de agosto de 2020 por mi correo electrónico o con Elia en la recepción."

16. El 2 de septiembre de 2020 Meléndez le comunicó a la Sra. Dulce Concepción, con copia a la Sra. Ana Ayala y Alicia Gallardo, que no había contestado al acomodo razonable porque lo que solicitaba era trabajar de manera totalmente virtual y que tenía pendiente una conversación con Monseñor Cummings.

17. A solicitud de la APS, el 4 de septiembre de 2000 Meléndez le entregó a la Sra. Mayrelis Díaz, Coordinadora del Departamento de Orientación y Consejería, los expedientes de estudiantes que tenía en su posesión.

18. El 11 de septiembre de 2020 el Director de la APS, Monseñor Cummings le suscribió una comunicación a Meléndez en la cual le reiteró que se requería su presencia en el centro de

trabajo y le explicó que la escuela era un sitio seguro debido a que se habían tomado las medidas establecidas por el CDC y que, no obstante, la institución deseaba comenzar un proceso interactivo con ella para ver qué otro acomodo se le podía brindar y le expresó que se comunicara prontamente con la Sra. Dulce Concepción.

19. El 14 de septiembre de 2020 Meléndez le respondió la comunicación al Monseñor Cummings expresando que no dudaba que la escuela hubiese tomado las medidas y precauciones para brindar seguridad, pero que no había recibido contestación en la afirmativa o negativa sobre la petición para continuar sus servicios de forma virtual. También presentó las alternativas de solicitar una licencia sin sueldo hasta el mes de diciembre de 2020 o que se evaluara si podía ofrecer servicios como contratista independiente.

20. El 18 de septiembre de 2020 la Sra. Dulce Concepción le envió una carta a Meléndez, vía correo electrónico, instándola a que pasara por la Oficina de Recursos Humanos cuanto antes para iniciar un proceso interactivo, conforme lo requería la American with Disabilities Act e indicando que, dicho proceso brindaría la oportunidad de interactuar para determinar el acomodo necesario y evaluar cualquier otra solicitud que tuviera la demandante.

21. El 22 de septiembre de 2020 la Sra. Dulce Concepción le envió otro correo electrónico Meléndez reiterándole que, desde el 18 de septiembre, le había enviado una comunicación para iniciar un proceso interactivo conforme lo requería la ley American with Disabilities Act y que aún no había recibido respuesta. En la comunicación le dio otra alternativa de asistir una semana a la academia y que, la otra siguiente, realizara el trabajo de manera virtual, que la idea era completar únicamente de 10 a 11 días mensuales presencialmente.

22. El 22 de septiembre de 2020 Meléndez le suscribió una carta a la Sra. Dulce Concepción en la que reiteraba su petición de continuar virtual todo el tiempo, como contratista independiente o con una licencia sin sueldo.

23. El 22 de septiembre de 2020 Meléndez le suscribió otro correo electrónico a la Sra. Dulce Concepción, con copia a la Sra. Alba Collazo y Francisco Vélez, en el que citó al Dr. Lorenzo González.

24. El 8 de octubre de 2020 Monseñor Cummings le suscribió una carta a Meléndez en la que expuso que se había negado reiteradamente a asistir a la academia para prestar los servicios para los cuales fue contratada. Le explicó en la carta que, debido a la naturaleza de su puesto, requería de sus servicios presenciales en la academia, aunque fueran tres días por semana. Le instruyó a que, a partir de la semana del 12 de octubre, tenía que reportarse al trabajo de manera presencial en la academia y que, de no cumplirse con dicha directriz, estaba violando el manual de empleados y constituía un abandono de servicios.

25. El 13 de octubre de 2020 Meléndez le contestó la carta al Monseñor Cummings y, entre otras cosas, expuso que ella no tenía que presentar evidencia médica a la academia, de acuerdo a la Ley HIPPA.

26. El 22 de octubre de 2020 Monseñor Cummings le suscribió una comunicación a Meléndez expresándole que, desde agosto, le estaban solicitando que se presentara a la academia para realizar sus labores y que había incumplido reiteradamente con las directrices impartidas, por lo que se le suspendía de empleo y sueldo del 22 de octubre al 20 de noviembre de 2020.

27. El 27 de octubre de 2020 Meléndez le comunicó al Monseñor Cummings que estaba en desacuerdo con la decisión tomada de suspenderla de empleo y sueldo y que, reiteradamente, había comunicado los riesgos por edad que tenía ante el COVID-19.

28. El 5 de noviembre de 2020 la Sra. Dulce Concepción le envió una comunicación a Meléndez expresando que el no reportarse a trabajar, constituía un abandono de trabajo.

29. El 12 de noviembre de 2020 Meléndez suscribió una comunicación a la Sra. Dulce Concepción, con copia al Monseñor Cummings y a la Sra. Alba Collazo, solicitando que se le pagaran unas horas que había trabajado a distancia.

30. El 11 de diciembre de 2020 Monseñor Cummings le envió una carta a Meléndez indicando que ésta no se había reportado a trabajar, incumpliendo reiteradamente con directrices, por lo que procedía a suspenderla de empleo y sueldo del 14 de diciembre de 2020 al 29 de enero de 2021.

31. El 11 de diciembre de 2020 Monseñor Cummings, también, le suscribió una carta a Meléndez en la que indicó que le pagarían los días de trabajo que estaba reclamando (16, 19, 20 y 21 de octubre), alegando ser un acto de buena fe y, le advirtió que no estaba autorizada a trabajar de manera virtual por lo que, de realizarlo, no se le estaría pagando.

32. El 21 de diciembre de 2020 el Departamento del Trabajo cursó una comunicación a la APS por una querella que hizo a Meléndez por salarios adeudados.

33. El 22 de enero de 2021 la APS, por conducto del Lcdo. Samuel Soto Alonso, sometió su contestación a la comunicación del Departamento del Trabajo.

34. El 20 de enero de 2021 la Sra. Alba Collazo le suscribió una carta al Departamento del Trabajo indicando que le pagarían a Meléndez los días que estaba reclamando.

35. El 31 de enero de 2021 Meléndez le suscribió una carta al Monseñor Cummings en la cual hizo un recuento de sus comunicaciones relacionadas a sus preocupaciones por la situación del COVID-19 y el requerimiento de que trabajara de manera presencial, alegó que ello había sido ignorado por la administración y reafirmó que continuaría ejerciendo su derecho a proteger su salud conforme a la Sección 16 del Artículo II de la Carta de Derechos de la Constitución de Puerto Rico.

36. El 2 de febrero de 2021 la Sra. Dulce Concepción le envió una comunicación a Meléndez indicando que se le habían brindado varias oportunidades para que cumpliera con el procedimiento de acomodo razonable y llenara los formularios correspondientes sin que cumpliera con dicha directriz, que se le había requerido que se reportara a trabajar físicamente negándose ésta a hacerlo y que, en vista

de ello, le concedían una última oportunidad hasta el 12 de febrero de 2021 para que se reportara o entregara la documentación, porque de no hacerlo entenderían que estaba abandonando su empleo.

37. Meléndez no se reportó a trabajar de manera presencial.

38. El 28 de febrero de 2021 Meléndez suscribió una carta al Monseñor Cummings y a la Sra. Dulce Concepción en la cual expresó haberse enterado de la cancelación de su plan médico mediante carta de Triple-S, cuestionó si era la expectativa de la APS el que interpretara que estaba despedida, afirmó que ella no había renunciado a su trabajo y reiteró su planteamiento de que la administración había ignorado sus preocupaciones.

39. El 1 de marzo de 2021 Meléndez le envió una comunicación por correo electrónico a la Sra. Dulce Concepción en la cual indicó que los hacía responsables de cualquier daño y costo asociado a la negligencia de no haberle informado con anticipación la cancelación de los planes médicos.

40. El 15 de marzo de 2021 la Sra. Dulce Concepción le suscribió una comunicación a Meléndez indicando que su despido por abandono de trabajo había sido efectivo el 15 de febrero de 2021, de conformidad con la comunicación de 2 de febrero de 2021 y, además, le informó sobre su derecho al Plan Médico al amparo de la Ley COBRA.

41. El 24 de junio de 2021 Meléndez le suscribió un correo electrónico a la Sra. Dulce Concepción expresando que, en vista de que fue despedida, solicitaba permiso para buscar sus pertenencias y reiteró que le debían el pago de las vacaciones.

42. El 6 de julio de 2021, la Sra. Dulce Concepción le contestó el correo electrónico a Meléndez.

El TPI comenzó por reconocer la emergencia que se suscitó con la pandemia del COVID-19. Sobre este particular, el foro de instancia arguyó que indiscutiblemente

> *para la fecha de los hechos del presente caso, estaba decretada la pandemia por COVID-19 y que, continuamente, el Gobierno de Puerto Rico estuvo emitiendo órdenes ejecutivas con el propósito de controlar el contagio de dicha enfermedad. Entre estas, se había dispuesto que las clases a los estudiantes del país no serían presenciales.*

Por otro lado, el TPI reconoció la discreción que se le confirió a los patronos privados con relación a la presencia física de su personal *vis a vis* el cumplimiento con las normas de distanciamiento social. De igual forma, el foro primario reconoció la existencia del derecho a proteger la salud. Sin embargo, esta última

no es óbice para incumplir con directrices y forzar la concesión de un beneficio discrecional del patrono.

Señaló el TPI que ciertamente, existían restricciones sobre el modo de operar en las escuelas, mas no una prohibición total. Además, la modalidad de trabajo remoto se implementó como una medida cautelar ante el contagio de COVID-19 y que para la fecha en que ocurrieron los hechos de este caso, se estaba flexibilizado en aras de intentar regresar a la normalidad presencial en determinados escenarios.

Por ello la APS estableció un proceso de solicitud para la autorización de trabajo virtual vía excepción. El TPI resalta que fue la propia señora Meléndez Ríos quién inició el proceso de solicitud e incluyó como justificación ciertos padecimientos médicos. Si bien es cierto que los adultos mayores corren mayor riesgo en caso de contagio de COVID-19, el TPI concuerda con la APS en que la edad y el padecimiento médico de la señora Meléndez Ríos no era justificación suficiente para conceder de forma automática la de solicitud de la apelante.

En cuanto a la alegada violación a la Ley HIPAA, el TPI encontró probado que la APS solo solicitó evidencia médica de las condiciones que la señora Meléndez Ríos alegó padecer. El TPI señala que para cumplir con este requisito no la APS no solicitó el expediente médico de la apelante. Además, señala que la señora Meléndez Ríos muy bien pudo haber presentado un certificado médico para satisfacer este requerimiento.

Por otro lado, expresó el TPI que la reclamación presentada ante el Departamento del Trabajo es de gran pertinencia para la querella de epígrafe toda vez que la suspensión de empleo y sueldo se debió a la insubordinación de la señora Meléndez Ríos. El TPI determinó que la apelante conocía la posición de la APS antes de acudir al Departamento del Trabajo. Por todo esto el foro primario

determinó que la señora Meléndez Ríos no estableció su acción de represalia *prima facie.*

El TPI encontró probado que las APS le brindó varias oportunidades a la señora Meléndez Ríos por seis meses antes de cesantearla. El foro de instancia determinó que de la prueba surge que la señora Meléndez Ríos propició las actuaciones de la APS en cuanto a las advertencias, sanciones y eventual despido. De manera que, el TPI declaró *Ha Lugar* la solicitud de sentencia sumaria de la APS.

Inconforme, la señora Meléndez Ríos presentó una moción solicitando determinaciones de hechos adicionales y reconsideración.[25] El TPI declaró *No Ha Lugar* la moción de la apelante.[26]

Insatisfecha aun, la apelante acude ante nos y alega que el foro apelado incidió de las siguientes maneras:

**Primero:** Dictar sentencia sumariamente en la que desestimó todas las reclamaciones de la apelante, a pesar de existir controversias de hechos esenciales respecto a la justificación del despido de la apelante.

**Segundo:** dictar sentencia sumariamente en la que desestimó todas las reclamaciones de la apelante, a pesar de que la apelada no refutó alegaciones afirmativas de la apelante respecto a su acción de represalias en el empleo; la acción por violación al derecho a la salud e integridad personal en el empleo bajo la Constitución de Puerto Rico y la acción por violaciones a la Reglamentación y Guías Establecidas por la Agencia de Seguridad y Salud Ocupacional (OSHA) federal y local, ante la Pandemia de COVID-19.

APS compareció mediante escrito en oposición. Contando con la comparecencia de ambas partes, procedemos a resolver la controversia ante nuestra consideración.

---

[25] Véase, apéndice de la apelante, págs. 342-357.
[26] Véase, apéndice de la apelante, págs. 369.

-II-

A.

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la sentencia sumaria, cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales. Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36; *Bobé v. UBS Financial Services*, 198 DPR 6, (2017). Se considera un hecho material esencial aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133 (2011). En ese sentido:

> *La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia, demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente. Regla 36.3 (e) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (e).*

Es decir, este mecanismo podrá ser utilizado en situaciones en las que la celebración de una vista o del juicio en su fondo resultare innecesaria, debido a que el tribunal tiene ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y solo resta aplicar el derecho. *Burgos López et al. v. Condado Plaza*, 193 DPR 1 (2015); *Mejías v. Carrasquillo*, 185 DPR 288 (2012). En sentido contrario, un asunto no debe ser resuelto por la vía sumaria cuando:

> *(1) existen hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o (4) como cuestión de derecho no procede. S.L.G. Szendrey-Ramos v. Consejo de Titulares, supra.*

El inciso (a) de la Regla 36.3 de Procedimiento Civil dispone que la moción de la parte promovente deberá contener:

> *(1) Una exposición breve de las alegaciones de las partes;*
> *(2) los asuntos litigiosos o en controversia;*

*(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*
*(4) una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*
*(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*
*(6) el remedio que debe ser concedido.*
*Regla 36.3(a) de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a).*

Asimismo, presentada una moción de sentencia sumaria, la parte promovida no deberá cruzarse de brazos ni descansar exclusivamente en meras afirmaciones o en las aseveraciones contenidas en sus alegaciones. *Rodríguez Méndez v. Laser Eye*, 195 DPR 769 (2016). Es preciso que la parte promovida formule, con prueba adecuada en derecho, una posición sustentada con contradeclaraciones juradas y contradocumentos que refuten los hechos presentados por el promovente. *Ramos Pérez v. Univisión*, 178 DPR 200 (2010). Por consiguiente, cualquier duda que plantee sobre la existencia de hechos materiales en controversia no será suficiente para derrotar la procedencia de la solicitud. *Oriental Bank v. Perapi et al.*, 192 DPR 7 (2014). Después de todo, la etapa procesal para presentar prueba que controvierta los hechos propuestos por una parte en su Moción de Sentencia Sumaria no es en el juicio, sino al momento de presentar una Oposición a la Moción de Sentencia Sumaria, según lo exige la Regla 36 de Procedimiento Civil. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100 (2015).

En ese sentido, la parte promovida también tiene la obligación de cumplir con las exigencias enunciadas en las cláusulas (1), (2) y (3) del inciso (a) de la Regla 36.3 (b)(1) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (b)(1). Le corresponde citar con especificidad cada uno de los párrafos, según enumerados en la solicitud de sentencia sumaria, que entiende se encuentran en controversia, al igual aquellos que no. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR

414 (2013). Dicha tarea deberá ser realizada de forma tan detallada y específica como lo haya hecho la parte promovente y haciendo referencia a la prueba admisible en la cual se sostiene la impugnación, con cita a la página o sección pertinente. *Id.* Ahora bien, la inobservancia de las partes con la normativa pautada tiene repercusiones diferentes para cada una. Al respecto, nuestro Tribunal Supremo ha señalado que:

> *Por un lado, si quien promueve la moción incumple con los requisitos de forma, el tribunal no estará obligado a considerar su pedido. A contrario sensu, si la parte opositora no cumple con los requisitos, el tribunal puede dictar Sentencia Sumaria a favor de la parte promovente, si procede en derecho. Incluso, si la parte opositora se aparta de las directrices consignadas [en la regla] el tribunal podrá no tomar en consideración su intento de impugnación de los hechos ofrecidos por el promovente. Meléndez González et al. v. M. Cuebas, supra.*

En ese mismo orden, nuestra jurisprudencia ha establecido que el deber de numeración no constituye un mero formalismo ni es un simple requerimiento mecánico sin sentido. Este esquema le confiere potestad a los tribunales para excluir aquellos hechos propuestos que no hayan sido enumerados adecuadamente o que no hayan sido debidamente correlacionados con la prueba. *SLG Zapata-Rivera v. J.F. Montalvo, supra.*

Ahora, si el TPI considera que no procede dictar sentencia sumaria en el caso que tiene ante sí, o que no procede conceder ese remedio en su totalidad, es obligatorio que cumpla con lo expuesto en la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, que dispone:

> *Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, ni se concede todo el remedio solicitado o se deniega la misma, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, y hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando los procedimientos ulteriores que sean justos en el pleito, incluso una vista evidenciaria limitada a los asuntos en controversia. Al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad.*

*A base de las determinaciones realizadas en virtud de esta regla, el tribunal dictará los correspondientes remedios, si alguno.*

Finalmente, destacamos que, según dispuesto por nuestro Tribunal Supremo, este foro apelativo se encuentra en la misma posición que los foros de instancia al revisar las solicitudes de que determinada sentencia sea dictada sumariamente. *Meléndez González et al. v. M. Cuebas, supra.* Por lo tanto, nuestra revisión es una *de novo*.

B.

La Ley Núm. 115-1991, según enmendada, conocida como la "*Ley de Represalias contra el Empleado por Ofrecer Testimonio"* tiene como propósito proteger a empleados públicos y privados de posibles acciones de sus patronos como consecuencia de acudir a un foro judicial, legislativo o administrativo o ante procedimientos internos de la empresa y brindar algún tipo de testimonio o información. *Feliciano Martes v. Sheraton*, 182 DPR 368, 392 (2011); Art. 2 de la Ley 115, 29 LPRA sec. 194a(a).

El citado Artículo 2(a) de la Ley Núm. 115-1991contempla una serie de acciones consideradas como represalias, dentro de las cuales encontramos que ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni

constituyan divulgación de información privilegiada establecida por ley. 29 LPRA sec. 194a(a).

Además, el Artículo 2 (c) de la Ley Núm. 115-1991 establece la manera en que se dilucidará probatoriamente la controversia:

> *El empleado deberá probar la violación mediante evidencia directa o circunstancial. El empleado podrá, además, establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por las secs. 194 et seq. de este título y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido. 29 LPRA sec. 194a(c).*

El Tribunal Supremo explicó que para establecer un caso *prima facie*, el empleado tendrá que probar mediante prueba directa o circunstancial: (1) que participó en una de las actividades protegidas por la ley, y (2) que subsiguientemente fue despedido, amenazado o sufrió discrimen en el empleo. *Feliciano Martes*, 182 DPR a las págs. 393-394 (Énfasis suplido).

Sobre el primer criterio, el Tribunal Supremo aclaró que no se limita a expresiones realizadas únicamente en procesos investigativos, sino que la protección de la Ley Núm. 115-1991 también cubre al empleado con respecto a cualquier testimonio o información, en cualquier foro, bajo cualquier procedimiento. *Id.*, a las págs. 394-395. Por su parte, el segundo criterio requiere que el empleado "haya sido despedido, amenazado o discriminado en el empleo subsiguiente a su incursión en la actividad protegida". *Id.*, a la pág. 395. En ese sentido:

> *[l]uego de examinar el Art. 2 de la Ley Núm. 115, supra, que exige al empleado prueba de que fue despedido, amenazado o discriminado en el empleo subsiguiente a su incursión en la actividad protegida, encontramos que dicho estatuto parece disponer que la proximidad temporal resulta suficiente al momento de establecer un caso prima facie por represalias al amparo de nuestro ordenamiento legal. [...] Así el legislador pretendió que, al establecer un caso prima facie, el empleado no se enfrentara a un proceso probatorio oneroso, sino que bastara la comprobación de que la acción adversa que experimentó ocurrió al poco tiempo de haber incurrido en la*

*alegada actividad protegida. Feliciano Martes, 182 DPR a la pág. 399. (bastardillas en la original).*

No obstante, en el caso de que la controversia no se configure dentro de un espacio temporal que se pudiere catalogar como de poco tiempo, el empleado debe comprobar la existencia de elementos adicionales que establezcan un nexo causal entre la actividad protegida y la acción adversa. *Id.*, a la pág. 400. Por consiguiente, el empleado deberá probar:

> *(1) que fue tratado distinto a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias, o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento de nexo causal. Lo anterior implica, necesariamente, un acercamiento caso a caso. Id.*

C.

En nuestra jurisdicción, se reconoce como un derecho constitucional el que todo trabajador seleccione libremente su ocupación y renuncie a ella. Art. II, Sec. 16, Const. del ELA de P.R., LPRA, Tomo 1. Cónsono con este mandato constitucional, se creó la Ley Núm. 80 de 30 de mayo de 1976, Ley Sobre Despidos Injustificados, 29 LPRA sec. 185a *et seq.* (Ley Núm. 80-1976), la cual establece un esquema que regula la retención y el despido de los empleados. Ahora bien, la referida ley no implica que existe una prohibición absoluta contra el despido de un empleado. Entiéndase, si existe justa causa, el empleado puede ser despedido. *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364 (2001). Adicionalmente, dispone el Artículo 9 de la Ley Núm. 80-1976 que será irrenunciable el derecho de un empleado que sea despedido de su cargo sin que medie justa causa a recibir indemnización. 29 LPRA secc. 185i. La referida ley dispone que se entenderá como justa causa para el despido "*aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono*". 29 LPRA secc. 185b. Añade la Ley Núm. 80-1976:

*Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:*

*(a)   Que el empleado incurra en un patrón de conducta impropia o desordenada.*

*(b)   Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.*

*(c)   Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*

*(d)   Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.*

*(e)   Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.*

*(f)   Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.*

***No se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley.*** *En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una cantidad igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo. 29 LPRA sec. 185b. (Énfasis suplido)*

Advertimos que la Ley Núm. 4 de 26 de enero de 2017, conocida como la *Ley de Transformación y Flexibilidad Laboral* (ley Núm. 4-2017), con vigencia inmediata, enmendó varios artículos de la Ley Núm. 80-1976. No obstante, el estatuto dispone en su Art. 1.2 que su aplicación es prospectiva. En específico establece que: "[l]os empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que

tenían previamente, según lo dispuesto expresamente en los Artículos de [e]sta".[27] Es decir, la aplicación de la Ley Núm. 4-2017 es prospectiva, cuando así se incorpora expresamente en el estatuto.

**El Art. 2.16 de la Ley Núm. 4 regula la extinción del contrato de empleo.** En particular, dispone que el contrato de empleo se puede extinguir por alguna de las siguientes maneras:

a. mutuo acuerdo de las partes;
b. las causas consignadas en el contrato de empleo;
c. la expiración del tiempo convenido o realización de la obra o servicio objeto del contrato;
d. *la renuncia o abandono del trabajo por parte del empleado;*
e. muerte o incapacidad del empleado más allá del periodo de reserva de empleo dispuesto en una ley especial;
f. jubilación o retiro del empleado;
g. cambio de patrono, salvo exista un acuerdo entre las partes o una ley en sentido contrario;
h. despido del empleado, o;
i. incumplimiento con normas de conducta. 29 LPRA secc. 122o.

-D-

La Ley Núm. 44 de 2 de julio de 1985, según enmendada (Ley Núm. 44-1985), se adoptó con el objetivo de garantizar la igualdad en circunstancias en las cuales personas con discapacidad física, mental o sensorial enfrentan tratos discriminatorios que limitan su oportunidad de participar, desempeñarse y competir adecuadamente en el campo laboral. 1 LPRA secc. 501 *et seq.*; *Guardiola Álvarez v. Depto. de la Familia,* 175 DPR 668 (2009).

En aras de incrementar la garantía sobre igualdad en el empleo, la Asamblea Legislativa enmendó la Ley Núm. 44-1985 mediante la aprobación de la Ley Núm. 105 de 20 de diciembre de 1991 con el propósito de atemperar nuestro estatuto con la Ley Pública Federal de 26 de julio de 1990, 29 USCA sec. 706 *et seq.*, conocida comúnmente como la Ley ADA. Esta enmienda introdujo

---

[27] 29 LPRA sec. 121(a).

la obligación de todo patrono de proveerle acomodo razonable a las personas con impedimentos en el lugar de trabajo. *García v. Darex PR Inc.*, 148 DPR 364, 385 (1999).

El acomodo razonable puede incluir, el proveer facilidades accesibles y disponibles para personas con impedimentos, rediseño del trabajo, modificación de horario de trabajo, reasignar a una posición vacante, y aquellos otros acomodos similares para personas con impedimentos. 42 USC sec. 12111(9)(A).[28] La responsabilidad de tomar dicha acción afirmativa es de tal envergadura, que solo se exime a un patrono de su cumplimiento en aquellos casos donde el acomodo requerido resulte en un esfuerzo económico extremadamente oneroso. *Guardiola Álvarez v. Depto. De la Familia, supra.*

Por su parte, en el Art. 1 de la Ley Núm. 44-1985 se definen los términos *acomodo razonable* y *persona con impedimentos físicos, mentales o sensoriales*. A saber:

> (b) **Acomodo razonable**- significará el ajuste lógico adecuado o razonable que permite o faculta a una persona cualificada para el trabajo, con limitaciones físicas, mentales o sensoriales ejecutar o desempeñar las labores asignadas a una descripción o definición ocupacional. Incluye ajustes en el área de trabajo, construcción de facilidades físicas, adquisición de equipo especializado, proveer lectores, ayudantes, conductores o intérpretes y cualquier otra acción que razonablemente le facilite el ajuste a una persona con limitaciones físicas, mentales o sensoriales en su trabajo y que no representa un esfuerzo extremadamente oneroso en términos económicos**.**
> Significará, además, la adaptación, modificación, medida o ajuste adecuado o apropiado que deben llevar a cabo las instituciones privadas y públicas para permitirle o facultarle a la persona con impedimento

---

[28] The term "reasonable accommodation" includes:

> A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities and, B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipments or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities"

cualificada a participar en la sociedad e integrarse a ella en todos los aspectos, inclusive, trabajo, instrucción, educación, transportación, vivienda, recreación y adquisición de bienes y servicios.

[...]

(d) **Persona con impedimentos físicos, mentales o sensoriales**- Significará toda persona con un impedimento de naturaleza motora, mental o sensorial, que le obstaculice o limite su inicio o desempeño laboral, de estudios o para el disfrute pleno de la vida y que está cualificada para llevar a cabo las funciones básicas de ese trabajo o área de estudio, con o sin acomodo razonable.

Se entenderá, además, que es una persona con impedimentos bajo la protección de este capítulo, toda aquella persona cuyo impedimento le limite sustancialmente su desempeño en una o más actividades principales del diario vivir**;** que la persona tenga un historial previo de esa condición o se le considere como que tiene dicho impedimento aun cuando no lo tiene.

Para los propósitos de este capítulo se considerará como impedimento sensorial aquel que afecte sustancialmente, la audición, visión, tacto, olfato y el habla. 1 LPRA secc. 501.

[...]

Por su parte, el Art. 5 de la Ley Núm. 44-1985, prohíbe que tanto las instituciones públicas como las empresas privadas ejerzan, pongan en vigor o usen procedimientos, métodos o prácticas discriminatorias de empleo por razón de impedimentos físicos, mentales o sensoriales por el mero hecho del tal impedimento. 1 LPRA secc. 505. La prohibición incluye desde la etapa de reclutamiento hasta la compensación, los beneficios marginales y las facilidades de acomodo razonable y accesibilidad, antigüedad, participación en programas de adiestramiento, promoción y cualquier otro término, condición o privilegio en el empleo. *Id.*

Cuando un empleado que alega estar cobijado bajo el palio de la Ley Núm. 44-1985 y solicita un acomodo razonable según dispone la referida ley, tiene que demostrar, primeramente, que es una persona con impedimento según lo define la ley, y segundo, que está

cualificado para llevar a cabo las funciones básicas de ese trabajo, con o sin el acomodo razonable. *Morales Bengochea v. Banco Popular*, 173 DPR 74 (2008)(Sentencia); *García v. Darex PR, supra.*

*Una vez el empleado formalice su solicitud de acomodo razonable, el patrono viene obligado a iniciar un proceso interactivo con dicho empleado para analizar si resulta posible conceder el remedio solicitado y la forma en que puede concederse el mismo.* A. Acevedo Colom, *Legislación Protectora del Trabajo Comentada*, 7ª ed. rev., 2001, pág. 272. A la luz de los anterior, *el patrono puede solicitar la información que considere necesaria para realizar la acción de acomodo razonable solicitada. Id.* (Énfasis suplido). El empleado entonces deberá producir la información requerida. De no hacerlo, no se le puede imputar responsabilidad al patrono por negarse a proveer el acomodo razonable solicitado. Esto es, toda vez que no se provea la información necesaria para proceder con una solicitud de acomodo razonable, no se le puede imponer responsabilidad al patrono. *Id.*, citando, *Templeton v. Nevada Services, Inc.*, 162 F.3d 617 (10th Cir. 1998).

Cabe resaltar que, para que surja la obligación del empleado proveer información, *esta debe ser indispensable para proveer el acomodo y debe estar relacionada a la condición que genera el impedimento.* Acevedo Colom, *op. cit.*, pág. 272. La petición de acomodo razonable no requiere que sea por escrito o cualquier otra forma en especial, basta que el patrono advenga en conocimiento de la necesidad del empleado de un acomodo razonable. *Morales Bengochea v. Banco Popular, supra*, citando; Acevedo Colom, *op. cit.*, págs. 285-286.

La obligación del patrono de proveer un acomodo razonable no significa que este tenga que proveer la mejor alternativa posible si existen diversas formas de proveer la alternativa presentada por el empleado o si existen otras alternativas disponibles. Acevedo

Colom, *op. cit.*, pág. 273. Por otro lado y a modo de excepción, un patrono no tendrá la obligación de conceder un acomodo razonable bajo la Ley ADA ni la Ley Núm. 44-1985 si el mismo representa un esfuerzo extremadamente oneroso para el patrono. 42 U.S.C. sec. 12111 (10)(A); 1 LPRA secc. 507a. Sin embargo, para determinar si el acomodo constituye un esfuerzo extremadamente oneroso, se examina principalmente la naturaleza y costo del acomodo necesario, los recursos financieros de la entidad, el número de empleados, y el efecto de los gastos y recursos o el impacto en las operaciones de las facilidades. 42 U.S.C sec. 12111 (10)(B).[29]

Es norma reiterada que la Ley Núm. 44-1985 se debe interpretar de la forma más beneficiosa para las personas con impedimentos. 1 LPRA secc. 511a. Cónsono con ello, la referida ley dispone en su Art. 14 que todas las ramas gubernamentales y las personas naturales o jurídicas, al interpretar esta legislación, deben utilizar una interpretación liberal y no restrictiva. *Id.* Se precluye la utilización, como precedente reductor del alcance de los derechos de las personas con impedimentos, de toda decisión de un tribunal o una agencia administrativa federal que interprete o haya

---

[29] Undue hardship:
   **(A)** In general
   The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).
   **(B)** Factors to be considered
   In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include -
      **(i)** the nature and cost of the accommodation needed under this chapter;
      **(ii)** the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
      **(iii)** the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
      **(iv)** the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

interpretado de una manera restrictiva y contra los intereses de las personas con impedimentos la Ley ADA. *Id.*

Por otra parte, el empleado demandante deberá presentar suficiente evidencia que demuestre lo siguiente: (a) que es una persona incapacitada según definido en la Ley ADA o la Ley Núm. 44; (b) que podía llevar a cabo las funciones esenciales de su puesto con o sin acomodo razonable; y (c) que aun conociendo el patrono de la incapacidad de la parte demandante, éste no hizo un esfuerzo razonable para proveer el acomodo solicitado. *EEOC v. Kohl´s Dept. Stores, Inc.,* 774 F 3d 127 (2014); *Freadman v. Metro. Prop. and Cas. Inc. Co.,* 484 F .3d 91, 102 (1st Cir.2007).

Por lo que, *el demandante tiene el peso de la prueba para demostrar que solicitó el acomodo razonable de forma precisa o suficiente. La solicitud deberá ser: (1) suficientemente directa y específica y (2) deberá explicar cómo el acomodo solicitado está relacionado con la incapacidad. Freadman v. Metro. Prop. and Cas. Inc. Co., supra.*

Además, el demandante deberá probar que el acomodo solicitado es razonable, que le permitirá llevar a cabo las funciones esenciales de su puesto, y que es viable que el patrono lo conceda. Si el demandante cumple con probar lo antes mencionado, el demandado deberá probar que el acomodo es una petición excesivamente onerosa. *Id.*

-III-

La señora Meléndez Ríos nos solicita la revocación de la sentencia emitida el 29 de mayo de 2024. Para ello, nos plantea la comisión de dos errores. En primer lugar, la apelante alega que el TPI erró al dictar sentencia sumaria y al desestimar todas sus reclamaciones ya que existen hechos esenciales en controversia sobre la justificación de su despido. Específicamente, la señora Meléndez Ríos alega que los hechos 15, 20, 21, 23, 24, 26, 29, 30,

31, 32, 33, 34, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 y 49 de la moción de sentencia sumaria de la APS están en controversia y que por ello, el TPI no debió adjudicar la controversia por la vía sumaria.

Sobre el segundo error, la apelante alega que el TPI erró al dictar sentencia sumariamente en la cual desestimó todas las reclamaciones de la apelante, a pesar de que la apelada no refutó alegaciones afirmativas de la apelante respecto a su acción de represalias en el empleo; la acción por violación al derecho a la salud e integridad personal en el empleo bajo la Constitución de Puerto Rico y la acción por violaciones a la Reglamentación y Guías Establecidas por la Agencia de Seguridad y Salud Ocupacional (OSHA) federal y local, ante la Pandemia de COVID-19.

Por estar intrínsecamente relacionados, atendemos ambos errores en conjunto. Veamos.

**HECHO 15**

Las oficinas donde laboraba la demandante y los demás consejeros profesionales tenían instalado un filtro HEPA, que estaba certificado para un ambiente seguro. **Exhibit 1, Contestación al Interrogatorio, párrafo 41, página 13.**

Este hecho surge de la contestación al interrogatorio que la señora Meléndez Ríos le cursó a la APS durante el descubrimiento de prueba.[30] Alega la apelante que este hecho es una conclusión desprovista de toda prueba técnica y científica de un perito con conocimiento especializado en la materia. En particular, la apelante alega que la persona que contestó el interrogatorio en representación de la APS no cuenta con el conocimiento científico sobre los filtros HEPA. No obstante lo anterior, la señora Meléndez Ríos no presentó prueba técnica o científica que demostrara si en efecto los filtros HEPA eran beneficiosos o no para la salud, por lo que la apelante no logró rebatir el hecho propuesto por la APS.

---

[30] Véase apéndice de la apelante, págs. 187-188.

**HECHO 20**

El 8 de octubre de 2020, el Director de la Academia del Perpetuo Socorro, Monseñor José E. Cummings, le suscribió una carta a la Sra. Awilda Meléndez, Consejera Profesional, en que le expuso que se había negado reiteradamente a asistir a la academia para prestar sus servicios para los cuales fue contratada y que tampoco había solicitado un acomodo razonable. Se le explicó en la carta que, debido a la naturaleza de su puesto, requería de sus servicios presenciales en la academia, aunque fueran de tres días por semana. Se le instruyó a que, a partir de la semana del 12 de octubre, tenía que reportarse al trabajo de manera presencial en la academia y que de no cumplirse con dicha directriz, estaba violando el manual de empleados y constituía un abandono de servicios. **Exhibit 13.**

8 de octubre de 2020

Profesora Awilda Meléndez
Consejera Profesional

Estimada Awilda:

Saludos....

Como es de su conocimiento, desde el mes de agosto, se le ha requerido que usted se presente a realizar sus labores de manera presencial en la Academia.

Usted se ha negado reiteradamente a asistir a la Academia para prestar sus servicios para las cuales fue contratada. Además, nos ha solicitado un acomodo razonable. **Para atender esta solicitud de acomodo razonable, la Academia en varias ocasiones le ha solicitado iniciar un Proceso interactivo para evaluar la evidencia médica y determinar qué tipo de acomodo se le puede ofrecer. Usted se ha negado también a iniciar el proceso interactivo.**

En cambio, nos ha pedido que se le permita trabajar desde su hogar, o que se le conceda una licencia sin sueldo o se le contrate como "contratista independiente".

Debido a la naturaleza de su puesto de trabajo, la Academia requiere que sus servicios presenciales en la Academia aunque sean tres días por semana. En una relación de contratista independiente, usted tendría que asistir a la Academia, cosa que usted se ha negado a hacer. No existe razón médica que justifique la consideración de una licencia sin sueldo y no es política de la Academia, como regla general, concederla.

A tales efectos, a partir de la semana del 12 de octubre usted deberá reportarse al trabajo de manera presencial en la Academia. De no cumplirse con lo aquí dispuesto, entendemos que se esta

violando el Manual de Empleados, además de constituir un abandono de trabajo.

Sin otro particular al respecto, quedo...

Monseñor José E. Cumming
Director

Sobre el hecho número 20, la apelante alega que este es incorrecto toda vez que ella solicitó el acomodo razonable antes de ausentarse. Ciertamente, de la precitada carta surge que la señora Meléndez Ríos solicitó el acomodo razonable. No obstante, lo hizo desde su hogar. Entiéndase, la solicitud del acomodo razonable se hizo cuando la apelante determinó *motu proprio* que trabajaría de forma virtual. De los hechos surge que la APS reanudó labores el 19 de agosto de 2020 y que la señora Meléndez Ríos se ausentó a su empleo en esa fecha. También surge de los hechos que la apelante le remitió una carta a la APS el 22 de agosto de 2020 en al cual solicitó trabajar de manera virtual. Ciertamente, primero vino el ausentismo y en segundo lugar la solicitud de acomodo razonable. Damos por incontrovertido el hecho número 20.

**HECHO 21**

El 13 de octubre de 2020, la demandante Awilda Meléndez, le contestó la carta del Director de APS, Mons. José Cummings y le expuso que ella no tenía que presentar evidencia médica alguna a la academia, de acuerdo a la Ley HIPAA, (Health Insurance Portability and Accountability Act de 1991), que protegen la confidencialidad y privacidad del paciente y que, la única razón para pedir el acomodo y no trabajar presencialmente, era su edad, que la ubicaba en el grupo de alto riesgo. **Exhibit 14,** veamos:

\*\*\*

13 de octubre de 2020
Monseñor José Cummings
Director

Esperando en el Señor que se encuentre bien de salud al igual su familia en estos momentos tan difíciles.

Presento mi respuesta a su carta fechada el 8 de octubre de 2020, sobre las labores de manera presencial. De inmediato, hay que clarificar que desde el 15 de marzo de 2020 al día de hoy, no se permite, por distintas Ordenes Ejecutivas de la

Gobernadora, las clases presenciales en Puerto Rico. Por lo tanto, hablar de labores y servicios presenciales esta fuera del alcance de estas órdenes ejecutivas.

Deseo comunicar, que mis peticiones a la Academia responden a mi derecho a proteger mi salud y mi vida. Además, tengo un deber de proteger la salud y vida de mi familia. Le expresé mi preocupación sobre el espacio físico y el aire confinado del Departamento de Orientación, ya que es un espacio cerrado y limitado donde compartimos, hasta seis personas, el mismo aire. Las áreas con estas características se han definido de alto riesgo. Mis múltiples peticiones en bienestar del personal de la Academia y el mío propio, dentro del contexto actual del COVID 19, siempre han sido ignorados por la Academia. Incluso, las tres alternativas que he ofrecido, nunca fueron contestadas, y es en su carta del 8 de octubre de 2020, que usted hace mención de ellas, rechazando todas. Estas alternativas están enmarcadas en la petición del Departamento del Trabajo a los patronos de empresas privadas, para ofrecer flexibilidad laboral.

***

**Sobre le petición de evidencia médica por parte de la Academia, es contraria a las disposiciones de la Ley HIPAA, que protege la confidencialidad y privacidad del paciente y su información médica. Esta protección es provista bajo la Regla de Privacidad de la Ley HIPAA. Es mi derecho, y lo estoy ejerciendo, proteger mi información médica. Lo relevante sobre el riesgo del COVID 19 es mi edad, la cual ustedes tiene en sus récords de personal. Mi edad me ubica en el grupo de alto riesgo.**

***

En cuanto al hecho número 21, la señora Meléndez Ríos alega que la APS omitió cinco párrafos de la carta que contienen información material y pertinente para resolver la controversia que se nos plantea. No podemos concurrir con la alegación de la apelante. En primer orden, los párrafos omitidos por la APS versan sobre los hechos del 4 de agosto de 2020, el caso positivo de COVID-19 en el plantel, las Ordenes Ejecutivas que prohibían el regreso a clases presencial, que la apelante nunca dejó de brindar sus servicios aun estando en su hogar y las alternativas que propuso la apelante para trabajar de manera virtual. Lo imprescindible de esta carta es que la propia señora Meléndez Ríos escribe *"[l]o relevante*

*sobre el riesgo del COVID 19 es mi edad, la cual ustedes tienen en sus récords de personal. Mi edad me ubica en el grupo de alto riesgo*".

No creemos que el hecho número 21 tergiverse el contenido de la carta de la apelante, sino que resalta lo que la propia apelante ha alegado desde 22 de agosto de 2020: que su edad la coloca en un grupo de alto riesgo para contraer COVID-19. Damos por incontrovertido el hecho número 21.

### HECHO 23

El 27 de octubre de 2020, la Sra. Awilda Meléndez le comunicó al Sr. Cummings que estaba en desacuerdo con la decisión tomada en suspenderla de empleo y sueldo y que, reiteradamente había comunicado los riesgos por la edad que tenía ante el COVID 19. La demandante insistió en que solicitaba el acomodo únicamente por su edad, **Exhibit 16**, veamos:

> 27 de octubre de 2020
>
> Monseñor José Cummings
> Director Academia Perpetuo Socorro
>
> Recibí su carta del 22 de octubre de 2020 referente a la suspensión de empleo y sueldo, desde el 22 de octubre al 20 de noviembre de 2020.
>
> Estoy en desacuerdo con la decisión tomada por usted de suspenderme de empleo y sueldo ya que es abusivo y me ocasiona daño. Reiteradamente comuniqué los riesgos por mi edad asociados al COVID 19. Tanto mi esposo y yo estamos en el grupo de alto riesgo. Además, soy la persona de mayor edad, 60 años, entre las orientadoras de la escuela intermedia y superior.
>
> Mi desempeño al completar todas las tareas como consejera, incluye trabajar un horario extendido sobre el horario regular de la Academia, no solo en la semana laboral sino también durante fines de semana. Ustedes conocen, que tengo un alto número de estudiantes con acomodos razonables en los grados 11 y 12. Se han exacerbados entre los estudiantes condiciones emocionales y atención especial a los padres. Esta decisión atenta contra el bienestar de los estudiantes y los padres. He sido su consejera desde grado siete y soy la persona que mejor conoce esta población, tanto a los estudiantes como a sus padres.
>
> Sus acciones y cartas constantes me hacen sentir presionada y estoy emocionalmente afectada por su decisión.
>
> Sra. Awilda Meléndez
> Consejera Profesional

El hecho número 23 está íntimamente ligado al hecho número 21 por tratarse de la edad de la apelante. La señora Meléndez Ríos niega, contrario a lo planteado por la APS, que su solicitud de acomodo razonable se deba únicamente a su edad. Arguye la apelante que en su carta enumeraron varios elementos de riesgo incluyendo el espacio limitado y cerrado. No obstante, en el segundo párrafo de la misiva solo se menciona la edad de la apelante y de su esposo como riesgo asociado al COVID-19. En ningún momento se menciona el espacio limitado y cerrado como un elemento de riesgo. Damos por incontrovertido el hecho número 23.

**HECHO 24**

El 5 de noviembre de 2020, la Sra. Dulce Concepción le envió una comunicación a la demandante, Awilda Meléndez expresando que el no reportarse a trabajar, constituía un abandono de trabajo. **Exhibit 17.**

**From:** Dulce Concepcion
**Sent:** Thursday, November 05, 2020 3:19 PM
**To:** Awilda Melendez
**Cc:** Mons Jose Emiliano Cummings; Alba Collazo
**Subject:** Nómina del 30 de octubre de 2020
**Tracking:** **Recipient** **Read**

Awilda Meléndez
Mons Jose Emiliano Cummings
Alba Collazo          Read: 11/5/2020 6:34 PM

Buenas Tardes

**En carta emitida el 8 de octubre se le requirió que por la naturaleza de su trabajo, se reportase al trabajo de manera presencial en la Academia, aunque fuese por tres días semanales. El no presentarse constituye una violación al Manual de Empleados y abandono de trabajo.**

Establecido lo anterior, el pago de dos días de salario en la nómina del 15 de octubre y dos días de salario de la pasada nómina del 30 de octubre no proceden por lo que se hará el ajuste en la nómina del 30 de noviembre.

**Dulce Inés Concepción**
Oficial de Recursos Humanos
Academia del Perpetuo Socorro

[Información sobre la remitente omitida por este Tribunal]

Alega la señora Meléndez Ríos que en el hecho número 24 se incorporan premisas que son una representación incompleta y errónea del contenido de la comunicación del 5 de noviembre de 2020. Arguye la apelante que es incorrecto concluir que no realizar las labores de su puesto de forma presencial equivale a abandono de empleo. La señora Meléndez Ríos discute que, como nunca dejó de realizar sus labores aun cuando se encontraba en su hogar, no se puede concluir que abandonó su empleo. Además, alega la apelante que la naturaleza de su empleo no requería que estuviese de forma presencial en el plantel. Somos del criterio que la señora Meléndez Ríos abandonó su empleo. De los hechos surge que la apelante se rehusó a reportarse a su trabajo de manera presencial. Nadie cuestiona que la apelante realizó su trabajo de manera virtual. Sin embargo, sí queda claro que la directriz de la APS era que sus empleados regresaran al plantel y aquellos que no quisieran regresar debían hacer una solicitud a esos efectos. La señora Meléndez Ríos incumplió y desafió las normas de la APS cuando se negó a reportarse a su trabajo de manera presencial. Consideramos que la actuación de la apelante constituye abandono de empleo.

> 26. El 11 de diciembre de 2020, el Director de la Academia del Perpetuo Socorro, Monseñor José Cummings le envió una carta a la demandante, Sra. Awilda Meléndez, en que, ante el hecho de que no se había reportado a trabajar incumpliendo reiteradamente las directrices, procedían a suspenderla de empleo y sueldo del 14 de diciembre de 2020 al 29 de enero de 2021. La demandante ni se reportaba a trabajar presencialmente ni participaba del proceso interactivo con el fin de lograr un acomodo razonable. **Exhibit 19.**
>
> 11 de diciembre de 2020
>
> Awilda Meléndez
> Consejera Profesional
> Academia Perpetuo Socorro
>
> CORREO ELECTRÓNICO
>
> Como les comunicamos a los empleados el pasado 3 de diciembre, el día 7 de diciembre se estaría

retornando a trabajar de manera presencial en la Academia en los días requeridos.

Al día de hoy, usted no ha asistido a la Academia ni ha llamado para justificar su incumplimiento con esta directriz de trabajar presencialmente en la Academia.

El pasado 22 de octubre de 2020, por una acción similar, de incumplir con una directriz de la Academia, se le suspendió de empleo y de sueldo por 22 días. Nuevamente, ante un incumplimiento reiterado con una directriz, procedemos a suspenderle de empleo y de sueldo del 14 de diciembre de 2020 al 29 de enero de 2021.

Mons. José E. Cummings
Director APS

La apelante objeta la conclusión que la APS hace en el hecho número 26 sobre la falta de participación de la apelante en el proceso interactivo para lograr un acomodo razonable. Alega la señora Meléndez Ríos que la APS nunca le explicó en qué consistía el proceso interactivo ni por qué la apelante debía comparecer de manera presencial al mismo. Surge de los hechos que el 11 de septiembre de 2020, personal del Departamento de Recursos Humanos de la APS le cursó una carta a la señora Meléndez Ríos.[31] En esta, la APS dispuso que *"[n]o obstante lo anterior, nuestra Institución desea comenzar un proceso interactivo con usted, para ver qué otro acomodo se le puede brindar. **Favor de comunicarse prontamente, con la señora Dulce Concepción para iniciar este proceso**"* (Énfasis suplido). Acto seguido, la apelante le remitió una carta a la APS el 14 de septiembre de 2020 en la que solo se limitó a cuestionar por qué la apelada no había contestado su petición de continuar sus servicios de manera virtual.[32] En lugar de indagar sobre el proceso interactivo y cómo se estaría llevando a cabo, la señora Meléndez Ríos se cruzó de brazos y se negó a participar del proceso interactivo. Por otro lado, no surge de los hechos que la APS

---

[31] Véase apéndice de la apelante, pág. 92.
[32] Véase, apéndice de la apelante, pág. 93.

haya requerido que el proceso interactivo se diera de manera presencial. Solo surge que la apelada le instó a la señora Meléndez Ríos que se comunicara a la mayor brevedad posible con el personal de Recursos Humanos. Ciertamente, la apelante se comunicó con el personal de la APS, pero solo para cuestionar sus directrices e insistir en que se le permitiera realizar sus labores de manera virtual aun cuando la APS ya había establecido su posición en este asunto. Somos del criterio que este hecho es uno incontrovertido.

### HECHO 29

La carta del Departamento del Trabajo vino luego de que la demandante fuera objeto de dos medidas disciplinarias por su insubordinación al no participar en el proceso interactivo, no presentar la evidencia medica solicitada y no presentarse a trabajar de forma presencial, aunque fuera parcialmente por varios meses.

La apelante alega que es erróneo el planteamiento esbozado por la APS sobre la acción que esta presentara ante el Departamento del Trabajo. Arguye la señora Meléndez Ríos que la apelada concluye incorrectamente que la acción por salarios dejados de cobrar se realizó luego de la segunda suspensión. Esto es, la señora Meléndez Ríos alega que comenzó el proceso ante el Departamento del Trabajo antes de ser objeto de suspensión por segunda ocasión. El 12 de noviembre de 2020, la apelante le remitió una carta a la APS solicitando el pago de horas trabajadas, pero no remuneradas. Según la propia apelante, el fin de esta carta era que la apelada reconsiderara su decisión de no pagarle los días trabajados. Al no recibir una respuesta inmediata, la apelante prosiguió con la reclamación ante el Departamento del Trabajo. Por otro lado, la apelante resalta que desde el 20 de noviembre de 2020 comenzó la reclamación sobre salarios no pagados ya que la APS no respondió a su solicitud.

De la prueba surge que el 21 de diciembre de 2020, el Departamento del Trabajo le remitió una carta a la APS notificándole

sobre la querella en su contra. En dicha carta, no se especifica en qué momento se radicó la querella. Lo único que demuestra esa carta es que el 21 de diciembre de 2020, la APS advino en conocimiento sobre la querella en su contra. La carta del Departamento del Trabajo llegó 10 días después de la segunda suspensión de la señora Meléndez Ríos. Ciertamente, el hecho número 29 es correcto en ese aspecto. En el hecho no se alega que la apelante presentó la querella luego de que se le suspendiera de empleo y sueldo. El hecho meramente señala que la carta se envió con posterioridad a las suspensiones de la apelante. La prueba en el expediente sustenta este hecho.

Por otro lado, la señora Meléndez Ríos reitera que no presentó prueba medica porque el proceso establecido por la APS no lo requería. Además, alega que su solicitud no fue por una condición incapacitante según lo define las normativas federales y locales. No estamos de acuerdo con esta aseveración. Como bien señaláramos, las normas aplicables a los acomodos razonables en el empleo le permiten a un patrono solicitarle pruebas médicas a un empleado durante el proceso interactivo. Esto es, prueba médica intrínsicamente relacionada a la condición que el empleado alegue tener. Lo anterior se debe al interés que tiene un patrono de proveer un acomodo razonable que se atempere a las necesidades de la empresa y de el empleado. En el caso ante nos, la apelante alega que su solicitud no fue por razones médicas, sino por otras circunstancias. No nos convence. De la prueba surge que la señora Meléndez Ríos solicitó un acomodo razonable debido a ciertas condiciones respiratorias que la ponían en riesgo de contraer COVID-19. La solicitud de la apelante se basó en su edad y sus condiciones respiratorias, de las cuales no presentó prueba. Damos por incontrovertido el hecho número 29.

**HECHO 30**

La comunicación del Departamento del Trabajo descrita en el párrafo veintiocho (28) fue contestada por el Lcdo. Samuel Soto Alonso el 22 de enero de 2021. El Lcdo. Soto expresó que la demandante únicamente había asistido los primeros dos días de clases de agosto, que los demás empleados han asistido a sus labores presenciales de forma parcial o se habían sometido a un proceso de acomodo razonable bajo ADA y que la demandante se había negado a cumplir con la directriz, se negó a participar en el proceso interactivo de la Ley ADA, y se negó a presentar evidencia médica, no obstante el hecho que se le indicó que tenía que trabajar de forma presencial en la Academia del Perpetuo Socorro. **Exhibit 22**

La señora Meléndez Ríos rechaza el hecho número 30 por tres razones: 1) la carta que la APS le remitió al Departamento del Trabajo no guarda relación con el reclamo de la apelante ante dicha agencia y solo fue un subterfugio en preparación al despido de la apelante, 2) la APS nunca le mencionó a la apelante que no le pagaría por el trabajo hecho de manera virtual, y 3) el acomodo propuesto por la APS no era hecho a la medida para la apelante y sus circunstancias.

En primer lugar, en la carta del 22 de enero de 2020, la APS le explicó al Departamento del Trabajo las razones detrás de la suspensión de empleo y salario de la apelante. Todo esto se retrotrae a la negativa de la señora Meléndez Ríos a presentarse en el plantel escolar. La APS no estaba preparando el despido de la apelante mediante esta carta. Recordemos que posterior a este comunicado, la APS le proveyó una ultima oportunidad para que se presentara en su trabajo. Segundo, la apelante por sí misma decidió trabajar de manera virtual sin el consentimiento ni autorización de su patrono. La insubordinación de la señora Meléndez Ríos provocó las sanciones ya conocidas. El hecho de que la APS pagó los salarios reclamados, no equivale a una admisión de su parte. Finalmente, hemos reseñado que un patrono no tiene que ofrecer el mejor acomodo, sino aquel que sea razonable y menos oneroso para su negocio. Las propuestas que le hizo la APS a la señora Meléndez eran

provisionales hasta tanto la apelante participara del proceso interactivo y, en otras ocasiones, fueron incentivos para que la apelante desistiera de su comportamiento insubordinado. Entendemos que este hecho esté incontrovertido.

### HECHOS 31 & 32

El 20 de enero de 2021, la Sra. Alba Collazo, le suscribió una carta a la Sra. Nelly Díaz del Departamento del Trabajo en que la Academia, de buena fe, iba a pagar los días que reclamaba la demandante, no obstante el hecho que desde agosto de 2020 no había ido un solo día a trabajar presencialmente. **Exhibit 23.**

El 31 de enero de 2021, la demandante Awilda Meléndez le suscribió una carta al Director de la escuela, Monseñor José E. Cummings reiterando su decisión de no trabajar presencialmente. **Exhibit 24.**

> 31 de enero de 2021
> Monseñor José E. Cummings
> Director APS
>
> Este comunicado es en respuesta a sus dos cartas del 11 de diciembre de 2020.
>
> He comunicado, desde el 22 de agosto de 2020, claramente a mis superiores mis preocupaciones sobre riesgos de espacios confinados relacionados al COVID 19, en particular el área de trabajo donde estoy asignada en el Departamento de Orientación. He referido a ustedes diferentes fuentes con las normativas emitidas por el CDC y OSHA sobre estos espacios confinados y grupos de edad. Esas comunicaciones, escritas y por llamadas vía celular, lo incluyen a usted con quién hablé el 1 de septiembre de 2020. Reiteradamente durante este primer semestre del año académico 2020-2021, las acciones de mis superiores y de la Academia han ignorado atender mis preocupaciones, las cuales no son resueltas por la opción de asistencia física al lugar de trabajo durante dos a tres días en la semana. Usted, como Director de APS, tiene la autoridad y la responsabilidad principal, para ofrecer una solución que atienda estas preocupaciones. Sin embargo, a la fecha de esta carta, tal solución nunca ha sido brindada durante el año académico 2020-2021. La conducta de mis superiores y la Academia han sido consistente en ignorar mis distintos comunicados y mis preocupaciones específicas. Es deber del patrono, proteger la salud de sus empleados.
>
> Siempre he trabajado y brindado los servicios de excelencia a mis estudiantes, padres, madres y a la facultad, de la única manera permitida en las escuelas, modalidad virtual. Solo las decisiones de la Academia y mis superiores, son las que han afectado estos servicios, al suspenderme de empleo y sueldo.

Tengo derecho a proteger mi salud y protegerme contra riesgos que atenten contra mi integridad personal y salud. Ante la falta de atender mis preocupaciones, continuaré ejerciendo este derecho como está consagrado en la Constitución del estado Libre Asociado de Puerto Rico, Artículo II Carta de Derechos, Sección 16.

Les clarifico, que ustedes nunca me habían informado, hasta las cartas del 11 de diciembre, que los días que no asistía físicamente al Colegio para hacer el trabajo virtual, no me lo pagarían.

Sra. Awilda Meléndez Ríos, CPL

La señora Meléndez Ríos argumenta que los hechos número 31 y número 32 son inmateriales a la controversia de autos, y nos refiere a los argumentos formulados previamente. Reiteramos, que los hechos relacionados a la carta del Departamento del Trabajo son de suma importancia para la controversia que se nos plantea. Damos por incontrovertidos los hechos número 31 y número 32.

### HECHO 33

El 2 de febrero de 2021, la Sra. Dulce Concepción, Oficial de Recursos Humanos de la Academia del Perpetuo Socorro, le envió una comunicación a la Sra. Awilda Meléndez en que le expuso que se le habían brindado varias oportunidades para que cumpliera con el procedimiento de acomodo razonable y llenara los formularios correspondientes, lo cual se había negado a hacer y, que simultáneamente no se había reportado a trabajar de forma presencial, según ordenado. En dicha carta se le ofreció una última oportunidad hasta el 12 de febrero de 2021 a reportarse a trabajar o entregar la documentación pertinente para solicitar un acomodo razonable y que, de no hacerlo, estaría abandonando su empleo. **Exhibit 25.**

2 de febrero de 2021

Sra. Awilda Meléndez, CPL

CORREO ELECTRÓNICO

Estimada Sra. Meléndez:

**Acuso recibo de la misiva enviada por usted del 31 de enero de 2021. A usted se le han brindado varias oportunidades para que cumpla con el procedimiento de acomodo razonable y llene los formularios correspondientes. No ha cumplido con dicha directriz. De igual manera, se le ha indicado que se debe reportar físicamente a las facilidades de la Academia. También se ha negado a hacerlo.**

> Al día de hoy, usted no se ha reportado a trabajar o entregado los formularios correspondientes para solicitar un acomodo razonable.
>
> **Le ofreceremos una última oportunidad hasta el 12 de febrero de 2021 para reportarse o entregar la documentación pertinente. De no hacerlo, entenderemos que estará abandonando su empleo.**
>
> Cordialmente,
> Dulce Inés Concepción
> Oficial de Recursos Humanos

La apelante alega que el hecho número 33 es falso toda vez que la APS no respondió a sus múltiples reclamos y preocupaciones. Por el contrario, alega la apelante que la APS adoptó un patrón de amenazas, hostigamiento y sanciones mientras ignoraba sus preocupaciones. Reitera la apelante, además, que su solicitud no era por razones medicas sino por otras circunstancias. Del expediente ante nos surge que la APS le respondió a la apelante sus misivas. En lugar de conceder el acomodo que la señora Meléndez solicitó, la APS la invitó a participar del proceso interactivo para poder dialogar y llegar a un mutuo acuerdo. Inclusive, la APS le propuso varias opciones. Solo que estas opciones no se ajustaban a la solicitada por la apelante. Reiteramos que un patrono no viene obligado a conceder el acomodo que solicite el empelado, sino el que resulte ser razonable.

Sobre la naturaleza de la solicitud, nos reafirmamos en nuestra determinación previa. La señora Meléndez Ríos realizó su solicitud de trabajo virtual al amparo de ciertas condiciones respiratorias. De su faz, la solicitud es una de acomodo razonable al amparo de la Ley ADA, *supra*, y la Ley 44-1985, *supra*. Por ello, la APS invitó a la apelante a participar del proceso interactivo que disponen las normas aplicables. Para dilucidar la naturaleza del acomodo y su razonabilidad, la APS necesitaba prueba medica referente a las condiciones que la señora Meléndez Ríos alegaba padecer. Véase, que no se requiere un expediente médico. Solo

prueba que demuestre la condición particular. Encontramos que el hecho número 33 no está en controversia.

### HECHO 34

El 28 de febrero de 2021, la Sra. Awilda Meléndez, demandante, suscribió una carta al Director de la escuela, Monseñor José E. Cummings y a la Sra. Dulce Concepción, Oficial de Recursos Humanos, alegando a que no había renunciado a su trabajo de Consejera Profesional Licenciada. **Exhibit 26.**

La apelante cuestiona el hecho número 34 por omitir información pertinente como la cancelación de su plan médico sin notificación previa. De igual forma, la apelante arguye que se omitió la pregunta que le realizó a la APS. Entiéndase, "*¿Es la expectativa de ustedes que yo interprete que estoy despedida?*". Finalmente, la apelante enfatiza que no renunció a u empleo.

En primer lugar, en la misiva del 2 de febrero de 2021 la APS expuso con claridad que se le concedía hasta el 12 de febrero para reportarse a su trabajo o proveer la documentación pertinente. De lo contrario, su incomparecencia en ambas instancias se consideraría abandono de empleo. La apelada fue directa en su comunicado. No había espacio para la interpretación. El despido acarrea la pérdida de beneficios. Finalmente, la alegación de la APS no es que la señora Meléndez Ríos renunció. La alegación de la apelada es que la apelante abandonó su empleo al incurrir de manera continua en actos de insubordinación. Se confirma el hecho número 34 como un hecho incontrovertido.

### HECHO 38

La plantilla de la Academia del Perpetuo Socorro a agosto de 2020, fecha en que se suscitaron los hechos del presente caso constaba de 132 empleados. **Exhibit 30.**

La apelante arguye que el hecho número 38 es inmaterial a la querella de epígrafe. Alega que el número de empleados no incide ni es un hecho sobre las controversias del caso y tampoco afecta su resultado. Entendemos la inclusión de este hecho, puesto que pone al tribunal en contexto para las alegaciones que le siguen. Por otro

lado, la apelante cuestiona la pertinencia del hecho y no su contenido. Se da por incontrovertido el hecho número 38.

**HECHOS 39, 40 & 41**

De todos los empleados que había en la Academia del Perpetuo Socorro a la fecha de agosto de 2020, había 45 empleados con 60 años o más de edad incluyendo a la demandante. **Exhibit 30 (nombre del empleado y fecha de nacimiento).**
**[Nombres omitidos por este Tribunal]**

La demandante era de las empleadas de menor edad en comparación con los empleados con sesenta (60) años o más, ver listado anterior. Incluye el Director de la escuela, Monseñor José E. Cummings, quien tenía 72 años al momento de los hechos, **Exhibit 1: Contestación al Interrogatorio, página 4**. Por lo que había 46 personas con 60 años o más.

De los 46 empleados que tenían 60 años o más, todos fueron a trabajar presencialmente y cumplieron con su horario desde agosto de 2020 en adelante, con excepción de 5 empleados que solicitaron un acomodo razonable y sometieron la evidencia médica. La demandante no presentó la prueba médica, no participó del proceso interactivo y no se presentó a trabajar presencialmente. **Exhibit 1: Contestación al Interrogatorio, Contestación a Pregunta 10, párrafo 4; Exhibit 2: Declaración Jurada de la Sra. Dulce Inés Concepción.**

Los hechos número 39, número 40 y número 41 versan sobre las personas mayores de 60 años que laboran para la APS. La apelada trae a colación esta información porque la apelante en su solicitud de acomodo, además de mencionar sus condiciones respiratorias, mencionó que su edad la colocaba en riesgo de contraer COVID-19. En estos tres hechos, la APS rebatió la alegación de la apelante: que el plantel escolar no era un lugar seguro por su condición de salud y su edad. La apelante nos invita a preguntarnos "*cuál de los empleados cuyos nombres se mencionan en el hecho Núm. 39 presentaron, al igual que la apelante, una reclamación al amparo de las dos causas de este pleito[…]*". Si esta Curia entrara a ponderar 1 pregunta que nos plantea la apelante, verdaderamente entraríamos en un asunto inmaterial. No se nos plantea la cantidad de casos que pueda tener la APS. El planteamiento de la apelada es que, contrario a lo aseverado por la

señora Meléndez Ríos, sus compañeros de trabajo mayores de 60 años estuvieron seguros en el plantel.

Por otro lado, este Tribunal está consciente de que la querella de epígrafe no es sobre discrimen por edad. Sin embargo, la propia apelante solicitó que se tomara en consideración, no solo sus condiciones respiratorias, sino que también su edad. De manera que, es imposible atender la controversia ante nuestra consideración sin mencionar el factor edad. Se tienen por incontrovertidos los hechos número 39, número 40 y número 41.

### HECHO 42
La única empleada que no se presentó a trabajar de forma presencial ni presento prueba medica de ningún tipo fue la demandante. **Exhibit 1 y 2.**

Sobre el hecho número 42, la apelante arguye que no es un hecho material a ninguna de las controversias. Esto es, alega la apelante que poco importa si esta fue la única empleada que no se presentó a trabajar de forma presencial. Sin embargo, la prueba ante nuestra consideración sustenta este hecho. Además, sirve para ilustrar la insubordinación de la apelante. Damos por incontrovertido este hecho.

### HECHOS 43, 44, 45, 46, 47, 48 & 49
En la posición de Consejera Profesional que ocupaba la demandante, habían a agosto de 2020, 5 empleados incluyendo a la demandante: Ver nombre y fecha de nacimiento: **Exhibit 2.**
**[Nombres omitidos por este Tribunal]**

Posterior a agosto de 2020, se presentaron a trabajar 3 consejeros profesionales, Louaned Molano, Ivelisse Laurido y Mayrelis Díaz. La Sra. Mayrelis Díaz era menor que la demandante por sólo tres años y se presentó a trabajar de forma presencial. La Sra. Chiroldes había solicitado un acomodo razonable presentando la prueba médica y se le concedió. **Exhibit 2.**

Los cinco (5) empleados que solicitaron acomodo razonable para trabajar todo el tiempo a distancia y participaron en el proceso interactivo presentando la prueba médica, se les concedió el acomodo solicitado, son los siguientes: **Exhibit 2.**
**[Nombres omitidos por este Tribunal]**

> Las personas arriba indicadas que solicitaron acomodo razonable para trabajar todo el tiempo a distancia y presentaron la prueba médica, se les concedió el acomodo razonable. Todos retornaron a trabajar de forma presencial el 17 de abril de 2021, cuando reanudaron las operaciones en la escuela de forma normal, **Exhibit 1 y Exhibit 2.** La única persona que no retornó a trabajar, fue la Sra. Liz Garcia, quien solicitó una licencia sin sueldo y se le denegó. **Exhibit 2.**
>
> La Sra. Liz García había solicitado una licencia sin sueldo, se le denegó la misma por lo que renunció. **Exhibit 2.**
>
> Con relación a la licencia sin sueldo, la Academia del Perpetuo Socorro no concedió licencia sin sueldo a ningún empleado posterior al cierre del gobierno a causa del COVID 10. La Sra. García lo solicitó y tampoco se le concedió. **Exhibit 2.**
>
> Los trabajos de forma presencial regular para todos los empleados de la Academia del Perpetuo Socorro comenzaron desde el 17 de abril de 2021 hasta el presente. **Exhibit 2.**

Sobre los hechos número 43, número 44, número 45, número 46, número 47, número 48 y número 49, la apelante nos presenta cuatro argumentos: 1) dos de las personas mencionadas en el hecho número 43 trabajan en un área distinta a la de la apelante, 2) el caso de la Sra. Chiroldes es distinto al de la apelante, 3) los hechos ocurridos luego del despido de la apelante no son relevantes para el caso de autos, y 4) el TPI erró al rechazar casi toda la prueba de la apelante a pesar de no haber sido controvertida por la apelada.

Sobre el primer asunto, el hecho número 43 no menciona que la apelante y las demás consejeras profesionales compartieran la misma oficina. Este hecho demuestra que el trabajo de la apelante se pudo llevar a cabo de manera presencial. Relacionado a esto, en el hecho número 44 se dispone que la Sra. Chiroldes solicitó un acomodo razonable junto con la prueba médica necesaria y que la APS lo concedió. La apelante arguye que, contrario a la Sra. Chiroldes, ella no solicitó un acomodo razonable. Como tal no necesitaba presentar certificación médica para ello. Hemos establecido que la solicitud de la apelante, en efecto, fue una

solicitud de acomodo razonable. Sin más que añadir sobre este particular, damos por incontrovertidos estos hechos.

Por otro lado, la apelante rechaza los hechos número 46 y número 49. Arguye la señora Meléndez Ríos que es inmaterial a los hechos de este caso que los empleados de la APS hayan regresado al trabajo presencial regular luego de su despido. Finalmente, la apelante alega que el TPI rechazó casi toda la prueba de la apelante. Arguye la señora Meléndez Ríos que el foro de instancia adjudicó credibilidad a base de documentos, contrario al derecho vigente.

Sobre los hechos número 46 y número 49, encontramos que su contenido está sustentado por la prueba documental que obra ante nuestra consideración. Por ende, determinamos que son hechos incontrovertidos.  Sobre la sentencia sumaria, es norma reiterada que este foro apelativo se encuentra en la misma posición que los foros de instancia al revisar las solicitudes de que determinada sentencia sea dictada sumariamente. *Meléndez González et al. v. M. Cuebas, supra.* Por lo tanto, nuestra revisión es una *de novo.* Luego de examinar el expediente junto a los escritos de ambas partes, este foro apelativo encuentra que la determinación del TPI es correcta.

De la prueba surge que la apelante laboró por dos décadas con la APS en calidad de consejera profesional. Que en marzo de 2020, comenzó uno de los periodos más dramáticos en la historia moderna del mundo: la pandemia del COVID-19. Es un hecho indubitado que de marzo a mayo de 2020 las operaciones de la APS se llevaron a cabo de manera virtual. De igual forma, es un hecho incontrovertido que agosto de 2020 la APS se dispuso a comenzar el año académico de manera presencial. La APS proveyó un procedimiento para que los empleados que no desearan regresar al plantel solicitaran trabajar de manera virtual vía excepción.

Es un hecho probado que la señora Meléndez Ríos se negó a regresar de manera presencial a su empleo. Esto, debido a que le preocupaba contraer el COVID-19 ya que la propia apelante indicó que tenía 60 años y tenía ciertos padecimientos respiratorios. Por ello, le solicitó a la APS trabajar desde su hogar todo el tiempo. Luego de evaluar la solicitud de la señora Meléndez Ríos, la APS encontró adecuado iniciar un proceso interactivo según los disponen la Ley ADA, *supra*, y la Ley Núm. 44-1985, *supra.* de igual forma, le solicitó proveer prueba medica de sus padecimientos. Lo anterior responde a que la solicitud de la apelante estaba directamente ligada a su salud.

La APS invitó a la señora Meléndez Ríos del proceso interactivo en múltiples ocasiones y ésta se negó. Primeramente, porque entendió que su solicitud no era de acomodo razonable bajo la Ley ADA ni bajo la Ley Núm. 44-1985. Segundo, porque consideró que la solicitud de prueba médica violaba la Ley HIPPA. La APS reiteró su compromiso con proteger su salud y le ofreció varias propuestas para que pudiera trabajar de manera virtual y presencial. Mientras esto ocurría, la apelante nunca se personó a su empleo por seis meses. Alega la apelante que nunca dejó de trabajar. Sin embargo, el mero hecho de trabajar desde su hogar cuando nunca se le autorizó a ello es un acto de insubordinación que pudo culminar con un despido inmediato. No obstante, la APS le proveyó varias oportunidades de regresar al plantel. La imposición de sanciones y el eventual despido por abandono se debió única y exclusivamente a la incomparecencia e insubordinación de la señora Meléndez Ríos. Todo lo anterior quedó probado y sustentado por la prueba que el TPI y esta Curia examinaron.

Queremos enfatizar que este foro apelativo está consciente y toma conocimiento de las múltiples órdenes ejecutivas y administrativas que instaban a los patronos a adoptar la modalidad

de teletrabajo con aquellos empleados que pudiesen ejercer sus labores desde sus hogares. De igual forma, reconocemos lo angustiante que fue la pandemia junto al temor y peligro del contagio. El COVID-19 cambió nuestra forma de vivir y de operar en nuestro día a día. De manera que, reconocemos y validamos la preocupación de la señora Meléndez Ríos sobre el contagio de COVID-19.

Dicho esto, la negativa de la APS de proveerle un acomodo razonable a la señora Meléndez Ríos se debió enteramente a su rechazo del proceso interactivo y de proveer información médica que sustentara su solicitud. Ante este cuadro fáctico, resulta inevitable concluir que la Sentencia apelada es una correcta a base de los hechos materiales indubitados.

-IV-

Por los fundamentos antes expuestos, se confirma la Sentencia apelada.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones